Good morning. I'm Vicki Marolt Buchanan, and I'm here on behalf of Nadia Kuzmenko. The focus of my argument is, once again, materiality. The defendants were denied the charge. You don't think it's an exhaustive issue, something different to say? Well, I just want to clarify. I want to bring up some issues that were addressed earlier. And, first of all, the defendants were entitled to defend the charges as filed. The charges in this case were filed that there were false statements in the URLs directed to these specific lenders, and, therefore, they were material to these specific lenders. So the case as charged, the people, the defendants were entitled to put on their evidence, the expert testimony, to rebut those specific charges. The government could have charged this case in several ways. And, Judge, it — the regulators, they could have charged the case in terms of whether the statements were material to the regulators or whether they were material to the ultimate buyers, but they didn't charge the case that way. So in a particular — in our particular case, the issue of materiality was well-preserved, I believe. I believe you would agree to that also. In terms of the testimony,  our lawyers went back after these questions, a series of significant and not significant, and went back into chambers and asked the judge to rethink his ruling on the unlimiting motion, and proffered to be asked about the securitization process, et cetera. I know there's a harmless error issue that's been brought up because they committed fraud, you know, that they lied, and so how should they, you know, why should they get off? Well, they should be able to go before a jury and have the jury make that decision. And on the other hand, as I said before, they — if the government had charged it in a different way, they wouldn't be necessarily getting off, or maybe they will, maybe they won't, if the jury actually hears this materiality evidence. I think one of the clear insights that I noticed in this particular case as I was going through the record was how Judge Mendez actually changed his view of the evidence in the case. Kagan. Let me stop a minute. The proffer with regard to — your expert was Portnoy, right? Correct. And the proffer was in terms specific to the particular lenders. I'm sorry? Wasn't the proffer in terms specific to the particular lenders? No. It's the — the proffer can be found at 3492. Yes, I'm reading it. On 3492, he will testify why the falsified documents alleged to have been used in this case were not material. He will explain the conduct of the lending institutions as well as the securitization process and what happened in the financial market. Further, he will explain why the lending institutions — and I take this to mean the particular — it says earlier, Professor Portnoy will testify as an expert on the mortgage meltdown involving the lending institutions involved in the indictment and discovery, the particular lending institutions. And then it goes on and says that he was going to explain the conduct of the lending institutions, meaning those lending institutions, right, why they would accept loans that were clearly falsified. He will opine that the alleged victims in the indictment, parentheses, the lending institutions, were not defrauded. So he's testifying about the particular lending institutions. It can be read that way. It can also be read generally. So it's, you know, it's a short statement, but I think it can be read generally. And in particularly during the arguments, counsel made it very clear that it was about the — what was going on in the industry, the mortgage industry generally at the time is going to be part of his testimony. Nobody was prescient and knew what was going to happen in Lindsay at the time, knew that that's how the evidence would come out. But I think that the offer was fairly — it was general in terms of what was going to be testified to. And industry standards were definitely going to be a part of it. Judge Mendez, after he — he originally denied the motions in Limoney, and at the time he denied the motions in Limoney, he said, you know, he analogized it when he was talking about negligence of the lending institutions. He analogized it to the banks putting money on a porch and someone coming up and stealing the money off the porch. And he said just because you steal the money off the porch, just because it's negligently laid on the porch doesn't mean that it's material. I mean, that it — that it isn't a crime to steal it. By the time he got to sentencing and had read the Sean Martin report, his analogy changed. And his analogy changed because he realized how involved the — these particular lending institutions were in this case. And his new analogy was the lending institution just said to these people, my client, you know, I'm — I'm opening up the door, you just come in and take it, and so that he could defraud someone else down the — down the road. So it's imperative that the people — that the jury receive some context of what was going on in the mortgage industry at the time and how far it went down the line. And at the time, it went way down the line, and it may have even gone beyond the victims of this case were not mentioned, not charged, and was not before the jury. And so that's basically — Not mentioned, not charged, meaning we're not in the indictment? They're not in the indictment. These — the indictment alleged against these particular lenders only. It did not talk about defrauding the next group of people down the line or you and me in our mortgages, in our 401ks. Do you want to reserve? Oh. You've got a minute. May I? Yeah. Thank you. May it please the Court. My name is Barry Morris. I represent Aaron New in this case. The Court may be relieved to learn that I'm not going to be discussing Lindsay at all, but the reality will not play a part in this argument. What will play a part in this argument is the government's introduction of false evidence, two areas of false evidence. One, they introduced forged signatures of my client, Mr. New. Second, they put a witness on who said she worked at the Cusmenco firm from 2005 to 2006. Unfortunately, the only paychecks for that witness were in 2009, and we called a witness who testified that she was, in fact, the secretary at the Cusmenco Realty, and she went there were 46 checks that were introduced showing that she'd been paid. Now, the government has a strange argument. It says that, well, we'd introduced false evidence. The jury gets to decide whether or not the signature is genuine. Well, but the evidence wasn't the evidence was what it was, right? The applications, it didn't only pertain to him, and it was pertinent to the case in any event, right? Right. The — whether it was his signature or not, if the government had put on somebody to say that this was, in fact, his signature, and to prove it, that would be one thing, but they didn't do that. The question is, did they use the fact that it was his signature in some fashion? Of course they did. How? First of all, every witness who testified about any of the real estate transactions was asked, and who is the person who interviewed you, Aaron Newt, directing your attention to page so-and-so? Does that reflect Aaron Newt? Yes. And that was done over and over again, because there were no witnesses to Aaron Newt signing these loan papers, because he didn't. So the government — But if they said that he interviewed him, that's — they said he interviewed them. What does that have to do with his signature? The point of it is, is that it's a false document, and the government seems to think that it's okay to introduce false evidence if the jury has — I'm sorry. It's not — what — it's false — it may be false that he signed it. Right. But the document is the document, and it is the application that was made, and it was a curtain into the case. Well, if the Court is to suggest — I'm not suggesting that the document itself was inadmissible. What I am suggesting is that the document could have been introduced with the government saying, and the signature, by the way, we have reason to believe that that was not signed by Mr. Newt. Then problem solved, because then it wouldn't be — the jury — it's not an answer to say what it — I think it ultimately did, actually, in the closing argument. Well, yeah, but that's a little late and a dollar short. I mean, the bottom line is, in closing argument, they conceded that it was false, but then they argued, well, maybe, I don't know, he wasn't certain. He wasn't 100 percent certain. So they tried to get the best of both worlds. But the fact — But people testified that he interviewed them or that he didn't interview them. Nobody testified that Mr. Newt interviewed them. Okay. So the only evidence of Mr. Newt interviewing them and the signature, a layperson looking at a document with a signature at the bottom is going to assume that it's introduced for the purpose of showing that he signed the document. And he didn't. And the government seems to think that's okay, because the jury — Well, actually, you didn't object, so — and the Pew error is pretty high standard to meet. True. So if we're looking at it under a plain-error review, tell me how it affected the jury's verdict. Well, first of all, when you introduce false evidence, that's in a different category than an ordinary misconduct. And the question is not whether or not it did influence the jury or would influence the jury, but whether it could influence the jury. But is it sure — if the government had said, here's this document, and by the way, we have reason to think the signature is not Aaron Newt — Right. — then the document could still have come in exactly as it came in. Yeah, but maybe Mr. Newt wouldn't have been convicted, because the document relates to other people involved in this case. But Mr. Newt's connection to the document is his signature. Then there's the other false evidence introduced by the government. But he also delivered the — he took the money from the escrow, delivered it to the people who were involved. Right. But that doesn't prove that he knew that there was any — Not a lot of money. It doesn't prove that he knew that there was anything wrong with the source of the money. You know, agents working under brokers always kick back some of the fee to the broker. There's nothing wrong with that. What was wrong is that if the loans were secured with false information. The other thing the government did is it introduced testimony of a witness that said that she worked there during the time of the indictment. Well, it turns out she didn't work there in terms of the indictment. What's the government's answer? Well, but she gave testimony that's corroborated in many respects. That's nice, except it's all false, because she said it all happened in 2005 and 2006, and she didn't work there then. She didn't work there in 2007. The — there was a check — checks were introduced that showed she showed — that showed that she was working there in 2009. You know, it's sort of obvious that in terms of the plain error doctrine, when you have the government deliberately introducing two items of evidence, extensive items of evidence — this is not a passing remark, and they're false. And the government argues that, well, you know, that's our case. Well, it just — how can that not be error? How can that not be plain error? It's clearly error, and it's plain because the — one of the basic rules as a prosecutor, I would hope, is you don't introduce false evidence. And in this case, they introduced false evidence, they argued the truth of the false evidence, and they secured a conviction. I would hope that in this country, under our Constitution, that that wouldn't be allowed, that a conviction wouldn't be allowed to stand on false evidence knowingly introduced by the government. Thank you, Your Honor. I have saved 30 seconds, for whatever it's worth. Good morning, Your Honors. May it please the Court. Gene Vorobiev on behalf of Mr. Shaftsov. And I'm going to address for our group the amount of loss issue. Our challenge is actually to the methodology that the district court used, which is to take the original value of the loan and subtract whatever was received in the foreclosure sale. We presented Professor Martin's report, which shows that the mortgages were securitized, and as a result, it is not clear that anyone has lost money at all, and even if there was any loss or it's going to be a future loss, it's going to be nowhere near the amount of the original principal balance of the loan. And while the district court wasn't required to be mathematically precise with the methodology, it has to be a reasonable estimate, and given Professor Martin's report, which the district court said, I find it persuasive, it's just not persuasive as to restitution, but he decredited, I don't see how using that formula in unease fact would be a reasonable estimate of the loss, of the actual loss in the case. So that's our basic argument on the loss. And I don't know if it will be the case. And as a general matter, this methodology has been approved. It has been approved in general, not on any facts that are close to our facts, not in this circuit, and I know Ms. Bickley disagrees with me. I don't think any other circuit has addressed this particular type of scenario. I mean, in the securitization context. Right. I think there were a couple of cases that mentioned securitization in general, but I don't believe there is any case, and certainly none that I found or none that was cited, where you have an expert saying, because they were securitized, you can't trace that there was ever a loss. So it's not a question of who lost. I understand that the cases say that if it's between this bank and that bank, we don't necessarily have to figure this out. But I think we have a deeper problem. The expert is saying, you cannot determine that anyone has lost money, and I think that's a fundamental problem for this methodology. If you can't say that anyone has lost money, and certainly not in anything approximating the value of the original loan, how can this be a reasonable estimate of the loss? So what do you think the loss was? Well, I think one possibility that was, in fact, I think, floated at the sentencing was actual gain. It's something that the guidelines allow the court to use. And in this case was actual gain to each defendant. How much money they profited, how they profited, and I think, you know, I don't think the court made specific findings, but the allegations were, for example, for my client, it was anywhere between $1.2 and $1.5 million, which would drop the increase in the loss down to 16 levels from 20 under the 2014 guidelines. And I think Peter Kuzmenko would be in somewhat of the same category. The other two defendants, the gain would have been a lot smaller, so for them, it would have been even more of a reduction. So it was something that the court could have used. If you cannot ascertain actual loss, you could go to gain. The guidelines allow this. And I think that might have been as reasonable as you're going to get. But if the government isn't able to produce any contrary evidence, and they apparently weren't in any of the cases, it sounds like, not only in ours, certainly in ours, there was no contrary evidence, then maybe gain is the best approximation you're ever going to get here. And you'd still, you know, it would be a loss increase of some amount. It just would not be 20 levels. And the issue is definitely preserved. It's a legal question. It's de novo for this court. So, I honestly, I cannot imagine a theory under which using the Morris methodology would be appropriate in this particular case. Let me ask you, so actual loss under the guideline that applies here is defined as means that reasonably foreseeable pecuniary harm that result. Correct. Yeah, I agree. Yes, yes. Right. How does your definition of actual loss mesh with how the guideline defines actual loss? Well, I don't think I reasonably foreseeable. Right. I think I'm using the same definition, Judge Perez. Well, does that mean, I was staring at this last night, does it mean that there has to be pecuniary harm, and it has to have been reasonably foreseeable? Or does it mean, one would think so, because it's called actual loss. Right. The other possibility is that it means reasonably foreseeable pecuniary harm, whether the harm happened or not. Well, I think that would, if that was the definition of actual loss, what would be the difference between that and intended loss? I think what the Court described last sounds more like intended loss. Well, there is a difference between the amount that they intended, of the intended loss, and the amount that was sort of objectively, reasonably foreseeable. And I don't know whether there's case law interpreting it, but it's a somewhat ambiguous phrase. My, again, I don't have a specific site for you, but my reading of the case is dealing with actual loss, is that the emphasis is on pecuniary harm. Somebody has to actually suffer the loss. And reasonably foreseeable is just to protect against pecuniary harm that nobody would have foreseen. Right. I think that's not really right. The loss has to have happened. And I think where reasonably foreseeable was litigated, where there was a question as to whether or not, you know, it was foreseeable that the properties would drop in value, things of that nature. That's not our problem. I think the government cannot prove, hasn't proven, that there was a loss to somebody, and certainly not anywhere close to what the original principle balances. I think if actual loss has to mean actual loss, that's my position. And your suggestion that it could be measured by the gain of the defendants is a separate provision or, I mean, it doesn't ---- I think it's in Guideline 2B1.1. I cannot tell you the specific application note. If the Court has a specific interest in it, I can try to submit a quick letter. But it's somewhere in 2B1.1. Thank you, counsel. Your Honor, if I can add one sentence. My client has a separate case dealing with the reimbursement of an attorney's fees. Apparently, the parties are in agreement that the order should be vacated and remanded for further proceeding. I just wanted to remind the Court. Yes, of course. Thank you. Thank you, Your Honor. I'm sorry. No, no, that's fine. I'll hear from the government. Good morning again, Your Honors. May it please the Court, Lee Bickley on behalf of the United States. I was also trial counsel in this case. With respect to loss, the Court calculated loss in this case as the principal amount of the loans minus the amount recovered in sales to third parties. This was consistent with this Court's case law in Morris, Hymas, and Young. The Hymas case involved cases, situations where loans were resold. The Young case specifically dealt with a case of securitization. And there, this Court stated that taking the principal balance on the loan minus any money recovered from a sale of the property was an appropriate approach in terms of making an estimate of loss. Well, I think that, in your honor, there is a loss that is spread amongst many different lenders in this scenario. So there is a reasonably foreseeable pecuniary harm here. What the issue is just who suffered specifically that harm. And, for example, the Eighth Circuit specifically found in a case with respect to securitization that although securitization may make it more difficult to allocate losses among individual banks or investors, the district court's method produced a reasonable estimate of loss. So the Eighth Circuit has specifically addressed this case. With respect to actual loss, the Seventh Circuit quoted that language in Engleman and calculated loss in a similar fashion, as this Court has done repeatedly and as the Eighth Circuit has done. The First Circuit specifically has said, provided that the total actual loss is reasonably foreseeable, its apportionment as between the original lender and a successor lender or other downstream purchaser does not matter. So this, the way the Court calculated loss here is consistent with this Court's case law and the case law in other circuits. And, honestly, to hold that the district court's loss calculation was inappropriate in this case would create a circuit split here. And with respect to Professor Martin's report, which counsel referenced, even there Professor Martin conceded that there may be investors who lost a small, albeit collectively large amount of money. Even he's admitting there's a loss here. He's just admitting that, he's just saying it was so spread out that it's so hard to calculate. So the United States asks that the Court calculate, affirm the district court's calculation of loss. And it's appropriate under what Morris says, that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct. I'm going to go in reverse order in terms of these arguments. I'm now going to move on to whether myself and my co-counsel proffered perjured testimony with respect to Natalia Kislitsa's testimony. We did not, Your Honors. Natalia Kislitsa, with respect to whether she worked at V.K. Tax Services, had told us repeatedly since 2011 that she worked at V.K. Tax Services in 2006 and 2007. My understanding of the argument is that you had the checks and that you could have and should have looked to see that she actually wasn't paid during that period. Your Honor, the checks were spread throughout discovery. And honestly, to this day, we still don't know what those checks are for. Those checks are, for example to the other woman. We don't know whether that they were for her being a receptionist at V.K. Tax Services. This is a situation where two people testified in contradictory fashions. Natalia Kislitsa said that she worked at V.K. Tax Services in 2006 and 2007. She was adamant about that on the stand. She talked about what she saw there. What she saw was corroborated by witness after witness after witness. For example, she saw Andre Kim come in and talk to Vera Kuzmenko and Nadia Kuzmenko. She even knew the amount of money he was charging them to create fake bank statements. He corroborated her testimony. She saw various witnesses come in to get their tax returns done and also to do real estate. Those witnesses corroborate during that time period that they were coming in to get their tax returns done and also to buy houses in this scheme. So again and again, as we discussed in the brief, Ms. Kislitsa's testimony is corroborated. On the other hand, we have Ms. Falley, who came in and testified that she was the receptionist, but she saw no real estate there. That's just not believable, Your Honor. She also — it's also — I do have one slightly weird question. There was a sentence in your answering brief on this point that was really odd where — and disturbing — where there was an argument that they — that you would interview her before her testimony. And the answering brief says, it might be possible that the first time Falley was interviewed by the government was on Saturday, January 30, 2015, between 1 and 1.10 p.m. via the telephone, which was after Kislitsa testified. What does that mean? Well, Your Honor, that was in response to something in the defendant's opening brief. No, but there's — I mean, A, it might be possible, is an odd phrase. B, where is this information coming from? You just, like — Well, Your Honor — Out of the sky? The defendants accused us of knowingly sponsoring perjurous testimony. They accused us in their opening brief of speaking with Falley prior to this trial and knowing that what she was going to say, that we still sponsored Kislitsa's testimony, we knew it was false. That is just not the case. We never spoke to Svetlana Falley before Kislitsa testified. And as the defendant — Telling us something with the strange phraseology of what you believe happened, although it's not in the record. Yes, Your Honor. And the reason it's not in the record is because none of the defense — the trial counsel and none of the defense counsel raised a NAPU argument at the district court level. So we couldn't get stuff like that into the record because it wasn't an issue. No one accused us of sponsoring perjury. Is an overall response to this that it should be a 2255? We shouldn't even address it? Your Honor, I don't think that this is warranted — that this argument is warranted of your time at this time. Then, with respect to Aaron New's testimony — I'm not at testimony — but with respect to his signature, it was not plain error here in a mortgage fraud case to introduce these loan applications. The defendants had even stipulated to their admission the loan applications. We weren't arguing here that he had signed these loan applications. In fact, at — in closing, we repeatedly told the jury that they can make their own decision with respect to whether he signed these loan applications or not. So, consequently — Did you suggest that he did? I believe we told the jury in closing that he could — that it was their decision to make. If he knew it wasn't true, then that wasn't a defensible argument either. We did not know it was whether he had signed these loan applications or not. For example, even the defendant's expert testified that one of the loan applications looked consistent with Aaron New's signature. So we had that — But he said it was a virtual certainty as to 12 or 13 of them. He said that it was a virtual certainty with respect to the selected ones that were given to him. And — but with respect to that testimony, he didn't say it was certain. And in addition, he testified that people can sign their names in different ways. And in addition, we had no reason to doubt that Aaron New had signed these signatures. Well, except that we know that other people, with regard to other brokers, that their signatures were being forged. Your Honor, but that even — that even shows the issue. For example, Victor Demchuk, the other broker, testified that his signature was forged. However, when the FBI went to interview him and he was shown these loan applications, he said, that's not my signature. He told them that. Whereas here is a situation where when the FBI went to interview Mr. New, he was shown 12 fraudulent loan applications. While the FBI agent does not remember whether he specifically pointed to the signature and said, is this your signature, we don't have Aaron New saying, oh, my gosh, that's not my signature. We don't have Aaron New showing the same shock that Victor Demchuk showed. And somebody could have signed for him with his knowledge. Pardon? Somebody could have signed for him with his knowledge. Yes. That certainly could have been the case. And in addition, whether he signed these loan applications was not how we proved that Aaron New was guilty of this crime. We proved that because he was getting all of these commissions, commission after commission on fraudulent loan transaction. He received payments from shell accounts that were used in his scheme. There was testimony from more than one witness regarding his involvement in the fraud. He was a straw buyer himself on one of the transactions. It was proven that he lied to the FBI. And Aaron New took the stand in this case, and the court and the jury did not find him credible. But wasn't some chunk of the evidence that he — his name appeared as interviewer on all of these forms, but in fact, he doesn't speak Russian and he didn't interview anybody? Well, we would ask questions such as, who is the mortgage broker for this loan application? Or, who is listed as the interviewer on this loan application? Is the mortgage broker and the interviewer the same person or a different person? They could be the same person or they could not be. And he was the mortgage broker. He was a licensed mortgage broker. But on these applications, was he the mortgage broker whether or not he was the interviewer or the person who signed them? Correct. For every loan application in which he's listed as the interviewer, he is also the mortgage broker. So he has to approve the loan applications. And there was testimony from various different witnesses with respect to his responsibility. Listed as the loan — as the — did he ever suggest that he wasn't the mortgage broker on these loans? No. He never did. Now, going back to the aspect with respect to the expert testimony in this case, this is another case where the trial court in this job — I mean, the trial court in this case did its job. It excluded an expert that was to testify regarding the reliance and negligence of the specific lenders in this case. This — their expert, Mr. Partanoi, was not to testify to general lending standards in the mortgage industry. The Court's ruling is appropriate under this Court's ruling in United States v. Lindsey and the Seventh Circuit's ruling in Betz-Kastan. The trial court understood in this case that the expert was to testify regarding the reliance and negligence of victims in this case. And that's the evidence it excluded. You can look to the SER 45-49 to see what exactly it excluded. It held actual reliance by the victim. In this case, it's alleged to be First Franklin Financial, is irrelevant to the element of materiality. The defendant clearly cannot point to loose lending practices of the victim financial institutions to establish a defense to the charges of wire fraud or conspiracy to commit wire fraud. It referred to the Leidos case as a case with nearly identical circumstances. As I discussed earlier today, that Leidos case is a case where the defendants were trying to say that Bank of America and the other banks to whom false statements were made were negligent and intentionally disregarded information. In the Leidos case, the Court held that the fact that Bank of America and those other banks to whom false statements were made in that case did not rely on the false statements, gave no weight to the defendant's false statements, or were negligent to the point of complicity was not exculpatory or relevant in a wire fraud case. Defendants in this case are just trying to rewrite the record. Partnoy was not to testify about general lending standards in the mortgage fraud industry and the general lending standards in the mortgage industry. As Judge Brezon mentioned earlier, their notice defined lending institutions as the alleged victims in the indictment. They specifically caveated what their testimony was going to be and narrowed it to those alleged victims in the indictment. Their jury instruction shows what they wanted to do. Then you must determine whether the false statements or facts submitted had a natural tendency to influence or capable of influencing the mortgage lending institution to part with money or property during the time period between December 2006 and December 2007. Even defendants in the reply brief concede that a conscientious attorney would naturally have tailored his or her proffer of expert testimony to the facts of the case of Barr. That's what they did. They were trying to present testimony with respect to the specific lenders. And that's just not a defense to wire fraud. And what they do in order to promote their argument, their current argument, is they refer to Michael Lewis books. They refer to the Martin Report. The Martin Report was not even in front of the Court during this case. And they do cute things in their briefs, like, for example, put industry standards into the language that they're using for what their notice was. That just was not in their notice. They were not presenting evidence of industry standards in the national mortgage industry. The United States has a harmless error should you decide that there was error in this case, and the harmless error is threefold. First of all, it goes to the evidence in this case, but it also goes to whatever any expert witness was going to testify to. This was not a case where any expert was going to say that it did not matter on the loan application what was written down. The occupancy box still needed to be checked. A certain income needed to be given. Any expert who testified would have admitted that these false statements in this case were material. In addition, this was a case where the defendants were not precluded from making a defense. The defense attorneys cross-examined Ms. Hansen at length. They asked whether First Franklin was a reputable lending institution. They asked about interest-only and balloon payment loans. They asked whether a loan was subprime or not. They asked whether anyone checked the representations and supporting documentation. They asked about First Franklin selling loans into the secondary market and whether First Franklin still owned any of the loans involved in this case. They got to ask about securitization. They were able to solicit testimony from a Mr. Mitros who had been involved in this case. He was also a licensed real estate agent who provided a straw buyer to Nadia Cosmenko and Vera Cosmenko. He said he did it because he knew that the straw buyer wouldn't be able to get approved and so Nadia and Vera could make it happen. He testified about stated loans and where all that needed to be done was to put the company name and provide a letter from the CPA. And that no documentation was needed. He testified to various different aspects of the mortgage industry at the time. They called they themselves called a First Franklin underwriter on the loans and questioned him about whether he checked what he checked and what he didn't check. They crossed the representative from the dental board about how easy it was to check certain representations. They were allowed to question borrowers about what financial entity owned the loans. And they argued in closing, banks, we heard people testifying in this case that people were banks were giving money away. They argued that there were commissions. They argued that the banks got appraisals. They argued everybody made money along the way. Even with all of this testimony about the negligence of lenders of with respect to First Franklin and the state of the mortgage industry at the time, the jury is still convicted. So if you look at what they were able to present in this case, which was a very robust case with respect to whether certain banks were bad, and in addition what any testimony would have been, and then if you also look at the facts of this case, once again, these are not stated income loans. The defendants were doctoring document after document after document. The lenders were requiring these bank statements. The lenders were requiring these tax returns. When you look at all of that, beyond a reasonable doubt — Sotomayor, the evidence was that they made no inquiry into anything but their — some minimal inquiry into their employment and appraisal. But they required certain supporting documentation. So for example, they required 12 months of bank statements. So both Vera Kosmenko and Nadia Kosmenko had to fake these bank statements. They paid Andre Kim in order to get them all faked to support the income representations. In other loans, for example, both Vera and Nadia were working at a tax shop, so tax returns were doctored up in order to support the representations. In other cases, for example, W-2s were doctored or 1099s were doctored, or they created business licenses, or they created fake rental agreements in order to support rental income in here. Document after document was submitted to lenders in order to support these false statements. And once again, this is a case where the defendants themselves admitted that these statements were material. You know, we have, once again, Vera Kosmenko funding bank accounts. Why would she do that if these statements were not material? Well, she thought they were material. She thought that they were objectively material. And in addition, these were big lies. These were not close calls by the lenders. So given the evidence in this case, the fact that the defendants were able to present a ---- Why does that matter? It matters with respect to harmless error, Your Honor. Why? Because it's one factor that the Court can consider with respect to ---- I know. You said that in your briefs, too, but I still don't understand why. Because the Court can consider what evidence there was, what the defendant ---- No, but I want to know specifically why the fact that these were big lies instead of little lies matters. Oh, I'm sorry. With respect to the big ---- I wasn't ---- I was misunderstanding you, Your Honor. It matters because this wasn't a case of fudging. You know, this wasn't, oh, well, this is a small ---- Why does it have to do with the materiality question? You had to lie a lot in order to get these loans, Your Honor. And that's why it matters. Well, these people had to lie a lot because they were very poor, and they chose to lie a lot, except rather than maybe a lesser amount that still would have gotten them a loan. But I don't know ---- I still don't get what it has to do with materiality. Well, if the banks didn't care about income or assets, the lies wouldn't have had to be so large. For example, you could have just said, oh, well, I make $0 or I make $1,000. But your whole point is that they weren't just going from $1,000 to a reasonable normal income. They were going from $0 to a very high income, and somehow that matters as to materiality. It's not important, but it's not a point that makes any sense to me. Your other points have some cogency. This one, to me, has none. I'm sorry that this one doesn't make sense to you. I know that I'm out of time. Do you, as the Court, have any additional questions? I think not. So thank you much for your argument. Thank you very much. And we'll hear rebuttal. Ms. Buchanan, you have one minute. I know you'll make good use of it. I will. Even though no one knew at the time that a future case like Lindsey would be coming out to set the standards for expert testimony in this context, the appellants said to the Court in the argument for Mr. Portner's testimony that having an accurate historical context regarding the mortgage industry at the time of the alleged offense would be critical in the determination of whether — From what I can see pretty quickly, a lot more of this came out in the cross-examination of Ms. Hanson in this case than in the others. It seemed that there was a lot of it that came in. So why wasn't that good enough? A lot of the material about — that, you know, they didn't care and they never checked anything, and this was all going out in the industry at the time and so on. Because it was in bits and pieces. It wasn't put together in a cogent testimony of an expert witness. The jury couldn't follow along these little snippets here and there. And also, they — you know, they did ask the judge to have some leeway on reliance, on the reliance issue, and he said no. And they repeated their request for the — for the expert testimony, because expert testimony is a whole lot different than a couple of cross-examination  Sotomayor Well, there aren't a couple. There are quite a lot. Okay. There were — there were some, but it wasn't — it wasn't enough to meet the burden of the expert testimony, and it doesn't meet the Lindsay standard. Under Lindsay, the jury should have been able to hear the expert testimony on why the false statements on the U.R.L.A. were material to these lenders, given the situation in the industry at the time, and not just some individual questions, cross-examination questions. Thank you. Thank you, counsel. And you have 30 seconds. I'll do it quickly. Yeah. I just want to respond to a couple of things. First of all, the government says, well, we had no idea what these checks were about. That's nonsense. Twenty-four of the checks have the pay period listed on them. One of the checks is labeled secretary. One's labeled salary. And that's — and two are labeled hours, and one was labeled two weeks. Now, those look like the paychecks to me. I'm gaining time. Okay. You just continued after that. You're about 10 seconds left. Right. These were — the checks were not spread out over a whole bunch of accounts. They were located in three accounts, mostly in one. She said we didn't raise this at trial. Of course we did. Introduced evidence to say — the checks to say that she's lying. The fact of the matter is that the government produced — But you didn't raise the NAPO claim as a NAPO claim. Excuse me? You didn't raise the NAPO claim as a NAPO claim. At the trial level, yes. But we raised the substance of it, namely that we put on evidence that said that the testimony and the evidence produced by the government was false. So it's sort of in a hazy area between plain error and not plain error, because the purpose of plain error rule is that the court should be aware of the issue so it can make a decision. Here, the issues were joined. They were there. The court knew that the government had presented evidence. It was expert testimony that the — But you didn't ask them to throw out the evidence. Excuse me? You didn't ask the judge to throw out the evidence that you were contesting. If I were the trial attorney, I would have done that. I agree. But they didn't do that. But that doesn't mean that this gets put in a trash can because it wasn't raised. It was raised. They did make a formal NAPO motion. That's right. But on the other hand, if there's anything that's plain error in our system of government, it's when the government introduces false evidence and tries to get a conviction. But the government maintains that it could explain some of this if anybody had raised it. So I repeat what I asked before. Why isn't this just not an appropriate issue on appeal? Because the fact of the matter is that the government didn't try to explain it. The government — Because they weren't asked. They had an opportunity — no. You put on one image, they put on contrary evidence. And it's not at all unusual in a criminal trial to have conflicting evidence. Actually — That's a different issue from whether they purposely put on perjured evidence. Actually, Your Honor, the defense called an expert on the handwriting. Government has lots of handwriting experts. If they thought it was genuine, they could have called a handwriting expert. They were aware of the issue. They decided not to contest it. The government responded to the allegation that they used — the witness who testified in Natalia was testifying as to the wrong period of time because of the checks. They didn't bring any contrary evidence. What they did in their brief and what they did here now is say, look what a reliable witness she is. Yeah, that's the stuff that happened outside the period of indictment. I think it's established beyond any reasonable doubt that she didn't work there during the period of time in the indictment. It's not established that she wasn't there. Excuse me? It's not established that she wasn't on the premises. Well, she came — It appears that she was on the premises. She came to lunch or whatever from time to time. That's — but the fact of the matter is that she admitted that Svetlana Fey was the secretary before her. So there's no question that she wasn't there as a — as she testified, and she didn't — wasn't in a position to see what she said during the time of the indictment. The first may be true. The second may not be true. Hmm? The first may be true, i.e., she didn't work there. The second may not be true, that she wasn't in a position to know. Well, as to things that — well, she testified this happened at a certain time. Right. She wasn't there at that time. Therefore, it can't be true. If it happened at another time — She wasn't there as a secretary, perhaps, but it isn't that she wasn't there. Well, then now we're creating our own evidence, Your Honor. I mean, it — But you thought that the evidence was that she knew these people, she hung out with them, she was there some of the time, quite apart from whether she worked there. Actually, the only evidence that she was there at any other time came from the secretary who was there, who said she came in for lunch every now and then. Other than that, the only testimony as to when she was present in the office was her false testimony that she was there during the period of the indictment. Thank you, counsel. The case just argued to be submitted for decision and will be in recess for the
judges: Thomas, Paez, Berzon